# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
### No. 23-2156V

| | |
|---|---|
| SCOTT O'KEEFE,<br><br>                Petitioner,<br><br>v.<br><br>SECRETARY OF HEALTH AND HUMAN SERVICES,<br><br>                Respondent. | Chief Special Master Corcoran<br><br><br>Filed: January 27, 2026 |

*Jessica Anne Olins, Maglio Christopher & Toale, PA, Seattle, WA, for Petitioner.*

*Mallori Browne Openchowski, U.S. Department of Justice, Washington, DC, for Respondent.*

## DECISION AWARDING DAMAGES[1]

On December 20, 2023, Scott O'Keefe filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleged that he suffered from Guillain-Barré syndrome ("GBS"), a Table injury, as a result of an influenza ("flu") vaccine received on September 22, 2021. Petition at 1. The case was assigned to the Special Processing Unit of the Office of Special Masters in April 2025.

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

Respondent recommended compensation for the claimed flu/GBS Table injury, and the case moved formally into the damages phase, in September 2024. ECF Nos. 23-24. The parties swiftly reached an impasse, however, and briefed their respective valuations of the case. Brief filed Dec. 23, 2024, ECF No. 30 (seeking $140,000.00 for past pain and suffering); Response filed Feb. 19, 2025, ECF No. 33 (proffering just $62,500.00); Reply filed Mar. 5, 2025, ECF No. 35. After further informal discussions (*see* Scheduling Order filed July 25, 2025, ECF No. 36), the parties confirmed that they remain at an impasse related to Petitioner's pain and suffering. Status Report filed Nov. 24, 2025, ECF No. 40. The case is ripe for adjudication. **For the reasons set forth below, I award $125,000.00 for Petitioner's past pain and suffering.**

## I.    Legal Standard

In another recent decision, I discussed at length the legal standard to be considered in determining GBS damages, taking into account prior compensation determinations within SPU. I fully adopt and hereby incorporate my prior discussion in Sections I – II of *Congdon v. Sec'y of Health & Hum. Servs*., No. 23-2025V, 2025 WL 2734068, at *1 – 4 (Fed. Cl. Spec. Mstr. Aug. 21, 2025).

In sum, compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Hum. Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering.[3]

## II.    Fact Record[4]

Petitioner received the at-issue flu vaccine during an appointment with his primary care physician ("PCP") on September 22, 2021. He had no directly relevant preexisting conditions, and was then 64 years old. Response at 2, citing Ex. 5 at 5, 7-9, 130; *see also* Ex. 16 at 3 (characterizing Petitioner as retired).

---

[3] *I.D. v. Sec'y of Health & Hum. Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) (quoting *McAllister v. Sec'y of Health & Hum. Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

[4] While I have not specifically addressed every medical record, or all arguments presented in the parties' briefs, I have fully considered all records as well as all arguments presented by both parties.

On or about eleven (11) days post-vaccination, on October 3, 2021, Petitioner developed new mental fog; numbness and tingling beginning in his fingertips and ascending through all four extremities; weakness; fatigue; unsteady gait; difficulty walking unassisted; and increased blood pressure. The first, limited medical evaluations – namely from paramedics responding to his home, evaluations at two separate hospital emergency rooms, and a primary care follow-up – were inconclusive, but also recommended a neurology initial consult. *See generally* Ex. 16; Ex. 3 at 9-14; Ex. 5 at 41-43; *id.* at 5

At the October 7, 2021 initial consult, the neurologist recorded a similar onset of symptoms, which had progressed to include difficulty seeing and swallowing. Ex. 4 at 5. Dr. Miller's differential diagnosis included GBS, and he recommended emergency evaluation. *Id.* at 6.

During his subsequent five-day hospitalization (from October 7-12, 2021), Petitioner underwent CT scans of the head and neck. An MRI of the brain found "abnormal diffusion restriction involving the medial medulla," and an MRI of the cervical spine found "multilevel degenerative cervical spondylosis with mild central stenosis and high-grade foraminal stenosis... severe at bilateral C5-C6 and left C6-C7"). Ex. 6 at 41-42. After undergoing a lumbar puncture, he was diagnosed with GBS, specifically the Miller-Fisher variant. *Id.* at 39.[5] His presenting symptoms of vertical nystagmus,[6] weakness in both legs, and parasthesias in both legs and both arms all "significant[ly] improve[d]" after a 4-day course of IVIg. He also received inpatient physical, occupational, and speech therapies. *Id.* He was discharged home in stable condition. *Id.*[7]

Petitioner's subsequent medical records are mostly limited to periodic outpatient neurology follow-up appointments. First, on October 18, 2021, the neurologist recorded that after being previously diagnosed with GBS and treated with IVIg, Petitioner was "doing exceptionally well. He has a bit of numbness over the tips of his fingers, but his vision has essentially resolved. There have been no other acute changes." Ex. 4 at 11. The physical exam findings were normal except for "mildly choppy pursuits" at cranial

---

[5] *See also* 42 C.F.R. 100.3(c)(15)(III) (explaining that the GBS Miller-Fisher variant is characterized by bilateral ophthalmoparesis; bilateral reduced or absent tendon reflexes; ataxia; and the *absence of limb weakness*).

[6] Nystagmus is defined as "an involuntary, rapid, rhythmic movement of the eyeball." Dorland's, *Nystagmus*, https://www.dorlandsonline.com/dorland/definition?id=34565&searchterm=nystagmus (last accessed Jan. 21, 2026).

[7] Petitioner's Brief at 12 provides that his October 2021 hospital course included gabapentin and an EMG, but that is not corroborated. It appears more likely than not that Petitioner was only recommended gabapentin and EMG/NCV studies in *2022. See* Brief at 7-8 (citing Ex. 7 at 13-14).

nerves 3, 4, and 6, and decreased deep tendon reflexes in all extremities. *Id.* at 12. The neurologist did not recommend any further care for GBS. *Id.*[8]

On December 15, 2021, the neurologist recorded that Petitioner felt his vision was "completely better"; other than "a little bit of numbness at the tips of the fingers, he was doing exceptionally well." Ex. 4 at 15. A physical exam confirmed that Petitioner's cranial nerves were now "full." *Id.* (No reflex testing was documented, however.) The neurologist wrote that Petitioner "had" the Miller-Fisher variant of GBS (in the past tense), and further follow-up appointments could potentially be with his primary care provider. *Id.*

However on April 14, 2022, Petitioner returned to the neurologist concerned that his GBS was causing ongoing weakness, numbness, and decreased sensation particularly in his left arm and left leg – which complaints were corroborated on the physical exam. Ex. 8 at 17-18. On April 21, 2022, the neurologist reviewed that EMG/NCV studies had found "no convincing evidence for a large-fiber polyneuropathy of left median or ulnar mononeuropathy." Ex. 8 at 7. But Petitioner's "ongoing neuropathic symptoms [were] likely related to GBS," and although those symptoms were "not particularly pain[ful]," he was prescribed a six-month supply of gabapentin. *Id.* at 7.

Later in 2022, the PCP documented that Petitioner was "largely recovered apart from some residual tingling of his fingers, 2 toes of left foot, and numbness around the left elbow." Ex. 7 at 4; *see also* Ex. 13 at 35 (subsequent PCP record regarding Petitioner being "largely recovered" from GBS).

After a one-year gap in neurological evaluation, Petitioner followed up on May 3, 2023, reporting that he had "generally done well" with his "eye symptoms basically resolved." Ex. 19 at 8. But he reported "ongoing… numbness over the tips of his fingers," and also "radiating pain in the left arm… seems to start in the mid-upper arm and radiate to the lower arm." Ex. 19 at 8; *see also id.* at 22 (telephone call two weeks earlier, reporting that the arm "may be getting a bit worse" since 2022). The neurologist noted that a May 3, 2023 EMG newly found "a moderate right and mild left" carpal tunnel syndrome ("CTS"). Ex. 19 at 9-10. Additionally: "The proximal issues at least raise the question of a cervical radiculopathy." *Id.*

---

[8] Instead, the neurologist's only active assessment was cerebral atherosclerosis, Ex. 4 at 12, and he also recommended a repeat MRI of the brain to further assess an abnormality in the medial medulla, Ex. 3 at 8.

Despite the neurologist's specific request (Ex. 19 at 10), the May 17, 2023 cervical spine MRI did not include comparison to that from the October 2021 hospitalization. Ex. 19 at 12. But the May 2023 MRI found "multilevel degenerative disc disease, most pronounced at C5-C6 and C6-C7," with "severe bilateral neural foraminal narrowing at C5-C6 and severe left-sided neural foraminal narrowing at C6-C7." *Id.*

At their (apparently last) appointment on May 22, 2023, the neurologist summarized that Petitioner "previously had GBS. He comes in now because of ongoing cervical issues as well as hand numbness." Ex. 19 at 6. After reviewing the recent imaging, the neurologist assessed: "Patient with left arm numbness. This may be a triple crush phenomenon.[9] He has ongoing nerve root impingement, but [he] also has CTS [carpal tunnel syndrome]. I suspect that cervical issues are playing a role. I doubt the GBS is playing much of a role at this time." *Id.* at 7. The neurologist referred back to the PCP, suggesting that it "may be worthwhile referring [Petitioner] to the spine center for an opinion." *Id.* The neurologist also referred Petitioner to physical therapy ("PT") at his request. *Id.*

The June 14, 2023 PT initial evaluation record lists Petitioner's chief complaint as "neck pain." Ex. 12 at 2. Petitioner recounted receiving a "flu shot 2 years ago, and got Guillain-Barré syndrome [GBS] and has N&T [numbness and tingling] in his B [bilateral] hands and fingers, L arm between his bicep and forearm, and N&T in two toes. His neurologist discovered a pinched nerve on the L side of his neck. Onset: October 2021." *Id.* Petitioner's pain (at worst) 4/10, and he had difficulty playing the guitar, playing golf, grabbing keys, and lifting things with the left arm. *Id.* After conducting a physical examination, the therapist assessed Petitioner with "glove syndrome and L arm numbness and weakness consistent with Guillain-Barré syndrome [GBS]… While he has MRI findings showing nerve foramen narrowing, he does not show any physical signs during the exam that these findings are contributing to his symptoms." *Id.* at 5. However, the therapist *did not* address the EMG findings of carpal tunnel syndrome, the neurologist's "doubt" about GBS contributing to the current complaints, or the recommendation for a spine specialist's consult (*see* Ex. 19 at 7).

At the June 2023 encounter, the physical therapist assessed Petitioner with a 35% functional limitation, offered a home exercise program ("HEP") aimed at strengthening his arms, and opined that formal therapy was not required (or moreover, "typically benefi[cial]" for GBS and peripheral nerve disease). Ex. 12 at 5.

---

[9] *Dorland's* does not offer a definition for *triple crush*, but it defines *double crush syndrome* as "compression or other damage of the same nerve at two different points, such as carpal tunnel syndrome with cervical radiculopathy." Dorland's, *Double Crush Syndrome*, https://www.dorlandsonline.com/dorland/definition?id=110529 (last accessed Jan. 21, 2026).

Petitioner has not filed any further records from medical specialists (e.g., neurology, physical therapy, the suggested spine center). Subsequent primary care records reference his "distant history" of GBS and "nearly full recovery." *See, e.g.*, Ex. 18 at 18, 15, 11, 8, 5 (organized chronologically).

As of June 2024, Petitioner[10] describes ongoing numbness and pain in his fingers; numbness in his left arm from the bicep to the elbow; left arm pain and stiffness with activity; and numbness in two toes. Ex. 21 at ¶¶ 1-5. These symptoms make it difficult to pick up small things like keys; turn the pages of a book or magazine; play guitar (which he had enjoyed for his entire adult life); and work around the house and in the yard. *Id.* Petitioner avers that these symptoms may sound minor to some, but they are life changing. *Id.* at ¶ 7.

### III.    Appropriate Compensation for Petitioner's Pain and Suffering

In this case, awareness of the injury is not disputed. The parties agree, and my own review of the evidence confirms, that at all times Petitioner was a competent adult with no impairments that would impact awareness of the injury. Therefore, I analyze principally the injury's severity and duration.

In performing this analysis, I have reviewed the record as a whole, including the medical records, affidavits, and all assertions made by the parties. I considered prior awards for pain and suffering in both SPU and non-SPU GBS cases, and rely upon my experience adjudicating these cases. However, I ultimately base my determination on the circumstances of this case.

The medical record evidence detailed above indicates that after the September 22, 2021 vaccination, Petitioner suffered a relatively mild case of GBS (specifically the Miller-Fisher variant) corresponding to a Table listing. After a several-day delay, GBS was appropriately diagnosed and treated effectively with one course of IVIg. The five-day hospitalization also featured CT and MRI imaging, a lumbar puncture, and various therapy sessions. This initial acute course was no doubt distressing, but also typical of GBS cases seen in the Program. In light of Petitioner's limited symptoms and "substantial recovery" during this short hospitalization, he was discharged home without any neuropathic

---

[10] I have also reviewed the statement from Petitioner's sister at Ex. 20 – but it largely supplements the medical records regarding Petitioner's GBS onset and acute treatment in October 2021, and it does not address his long-term course or potential residual effects from GBS.

It is further noted that the statements at Exs. 20-21 lack notarization – but they are made under penalty of perjury. *See* 28 U.S.C. § 1746 (providing that such a statement may be given "like force and effect" as a notarized affidavit).

medications or any need for inpatient rehabilitation, home health services, or formal PT. I note that roughly six months after the GBS onset, in April 2022, Petitioner and his neurologist felt that his GBS was likely causing *some* residual weakness, numbness, and decreased sensation particularly in his left arm and left leg, which justified a trial of gabapentin. But these residual symptoms were "not particularly pain[ful]" (Ex. 8 at 7), and he was nonetheless characterized as "largely recovered" from GBS (Ex. 7 at 4; Ex. 13 at 35). The 2022 records, and the subsequent one-year gap in neurology evaluations, support that Petitioner may have had some ongoing GBS residual effects, but they were not significantly disruptive.[11]

Petitioner has not preponderantly established that GBS explains his entire clinical picture for treatment obtained in subsequent years. He emphasizes the June 2023 *physical therapy* assessment that his ongoing symptoms were consistent with GBS (Brief at 8-9, citing Ex. 12 at 3-4). But that assessment does not appear to incorporate the entire history, including Petitioner's arm potentially becoming *more* painful well after his GBS onset (*see* Ex. 19 at 8, 22) and the additional, potentially additive findings of cervical radiculopathy *and* carpal tunnel syndrome. In contrast to the physical therapist, the *neurologist* with a more complete understanding of Petitioner's case believed that all of these conditions were relevant (suggesting a "triple crush phenomenon, and "doubt[ing] the GBS is playing *much of a role*" as of May 2023 (Ex. 19 at 7, emphasis added).

Turning to the parties' specific valuations, Petitioner has requested $140,000.00 for his past pain and suffering. Brief at 9-12. But I have explained above why his claimed residuals are not fully proven – and his cited cases[12] are distinguishable for other reasons as well. As Respondent observes (Response at 9-10), the *Shankar*, *Black*, and *Lemon* petitioners all had more extensive acute treatment.[13] *Sand* and *Walter* are not great fits

---

[11] Despite Petitioner's assertion of ongoing "decreased vision" (Brief at 12), Petitioner apparently did not follow through with a contemplated ophthalmology consult (referenced at Ex. 13 at 31) and the neurologist later reiterated (in May 2023) that Petitioner's "eye symptoms basically resolved" (Ex. 19 at 8). Petitioner also references erectile issues (Brief at 12), but the medical records suggest a gradual *worsening* of issues that *predated* the GBS (*see e.g.*, Ex. 5 at 53).

[12] Citing *Sand v. Sec'y of Health & Hum. Servs.*, No. 19-1104V, 2021 WL 4704665 (Fed. Cl. Spec. Mstr. Aug. 31, 2021) (awarding $130,000.00 for past pain and suffering); *Walter v. Sec'y of Health & Hum. Servs.*, No. 21-1461V, 2024 WL 1299576 (Fed. Cl. Spec. Mstr. Feb. 27, 2024) ($130,000.00); *Shankar v. Sec'y of Health & Hum. Servs.*, No. 19-1382V, 2022 WL 2196407 (Fed. Cl. Spec. Mstr. May 5, 2022) ($135,000.00), mot. for recons. den'd, 2023 WL 2343947 (Fed. Cl. Spec. Mstr. Mar. 2, 2023); *Black v. Sec'y of Health & Hum. Servs.*, No. 21-2164V, 2024 WL 3467272 (Fed. Cl. Spec. Mstr. June 11, 2024) ($140,000.00); *Lemon v. Sec'y of Health & Hum. Servs.*, No. 22-0701V, 2024 WL 3160695 (Fed. Cl. Spec. Mstr. May 23, 2024) ($145,000.00).

[13] *Shankar*, 2022 WL 2196407 at *5 (summarizing that the *Shankar* petitioner "endured nearly two weeks of hospitalization [and] inpatient rehabilitation, and several months of physical and occupational therapy"); *Black*, 2024 WL 3467272 at *3 (stating that the *Black* petitioner's "in-patient care occurred over two weeks" and was followed by "minimal" physical therapy); *Lemon*, 2024 WL 3160695 at *3 (reviewing that the *Lemon*

because each features an *extended delay* in the recognition of GBS, and thus delay in the start of appropriate treatment.[14]

At the same time, Respondent's proffer of just $62,500.00 is unjustified in this context. I have consistently explained that even a mild case of GBS will typically result in a past pain and suffering award of over $100,000.00, in part due to its frightening and serious initial phase. *Congdon*, 2025 WL 2734068 at *3-4. I have only awarded less on one occasion, in the *Granville* case.[15] *Granville* did feature a fairly limited five-day hospitalization with a lumbar puncture and one course of IVIg, and no inpatient rehabilitation or formal outpatient therapy. But in *Granville*, the evidence – including both the medical records, and the petitioner's own statement – *fully* supported a "quick and *full* recovery" within the first year. *Granville,* 2023 WL 6441388, at *4 (emphasis added). I have consistently noted *Granville* to be an outlier for this reason. In contrast here, there is support that for over a year, Mr. O'Keefe's GBS has resulted in some (if not significantly disruptive) decreased endurance and strength, and his GBS has also potentially contributed (alongside *other* neurological conditions) to his sensory symptoms.

Respondent (*see* Response at 8-9) also avers that his position here is supported by a five-figure award in *Geschwindner.*[16] But Petitioner persuasively observes (*see* Reply at 4) that the original award from this decision is not instructive, because it was set aside (due to ineffective assistance of counsel), and Mr. Geschwindner was eventually awarded *$120,000.00* for his past pain and suffering.[17]

---

petitioner "received various therapies in her home for approximately 2.5 months" after her hospitalization). As already noted, Mr. O'Keefe was hospitalized for just five days with no inpatient rehabilitation, home health services, or formal PT (until a PT initial consult over two years after the GBS onset).

[14] *Sand*, 2021 WL 4704665 at *6-7 (noting that the *Sand* petitioner was never hospitalized, only received gabapentin from outpatient providers, and had preexisting areas of neuropathic pain); *Walter,* 2024 WL 1299576, at *3-4 (reflecting that the *Walter* petitioner was discharged from the hospital, and later received IVIg on an outpatient basis). Here, Mr. O'Keefe's GBS was not recognized for about three days – but afterwards he was admitted to the hospital and effectively treated with IVIg.

[15] *Granville v. Sec'y of Health & Hum. Servs.*, No. 21-2098V, 2023 WL 6441388 (Fed. Cl. Spec. Mstr. Aug. 30, 2023) (awarding $92,500.00 for past pain and suffering).

[16] *Geschwindner v. Sec'y of Health & Hum. Servs.*, No. 17-1558V, 2022 WL 177372 (Fed. Cl. Spec. Mstr. Jan. 28, 2022) (*initially* awarding $92,500.00 for past pain and suffering).

[17] *See Rodriguez v. Sec'y of Health & Hum. Servs.*, No. 23-0591V, 2025 WL 1927640 at *4 (Fed. Cl. Spec. Mstr. June 23, 2025) (stating that *Geschwindner* "involves peculiar procedural facts that render it a poor comparison case – for virtually any other context"); *Taylor v. Sec'y of Health & Hum. Servs.*, No. 22-0335V, 2025 WL 2304630 at *6 (Fed. Cl. Spec. Mstr. July 8, 2025) (reiterating that "the precise determination from *Geschwindner* loses some of its heft as guidance").

Overall, I find that an appropriate award for past pain and suffering in this case should recognize Petitioner's experience of GBS, a characteristically alarming initial injury requiring inpatient hospitalization and urgent medical attention, and with some ongoing symptoms such as fatigue and abnormal sensation. But Petitioner's GBS was comparatively mild. The vision problems unique to the diagnosed Miller-Fisher variant of GBS resolved quickly. The acute treatment course was less than that in cases like *Shankar*, *Black*, and *Lemon*. The medical records endorse Petitioner achieving a substantial recovery from GBS and there being some potential alternative/ contributory conditions relating to his ongoing complaints. Petitioner was also a retired individual without documented disruptions to employment or other significant obligations. Finally, I find comparable the recently decided *Woodward* case, in which I found $125,000 to be an appropriate past pain and suffering for another individual diagnosed with the Miller-Fisher variant of GBS who improved significantly during a four-day hospitalization, received nearly no outpatient therapies, and returned to work within months.[18] **I therefore find that a fair and appropriate award for past pain and suffering in this case is $125,000.00.**[19]

## Conclusion

**I hereby award Petitioner a lump sum payment of $128,565.79 (representing compensation in the amounts of $125,000.00 for past pain and suffering, $3,424.76 for actual unreimbursable medical expenses, and $139.03 for mileage)[20] to be paid through an ACH deposit to Petitioner's counsel's IOLTA account for prompt disbursement to Petitioner.** This amount represents compensation for all damages that would be available under Section 15(a).

The Clerk of Court is directed to enter judgment in accordance with this Decision.[21]

**IT IS SO ORDERED.**                              **s/Brian H. Corcoran**
                                                    Brian H. Corcoran
                                                    Chief Special Master

---

[18] *Woodward v. Sec'y of Health & Hum. Servs.*, No. 23-2075V, 2025 WL 4072363 (Fed. Cl. Spec. Mstr. Dec. 17, 2025).

[19] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required. *See* Section 15(f)(4)(A); *Childers v. Sec'y of Health & Hum. Servs.*, No. 96-0194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Hum. Servs.*, 32 F.3d 552 (Fed. Cir. 1994)).

[20] The parties stipulated to the expenses. Reply filed Mar. 5, 2025 (ECF No. 35) at n. 2; *accord* Petitioner's Status Report filed Nov. 24, 2025, ECF No. 40.

[21] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.